IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**KELLY S. LYNAUGH**
1249 E. Mifflin Street
Madison, Wisconsin 53703

    Plaintiff,

    vs.

Case No.: 15-cv-645
JURY TRIAL DEMANDED

**MADISON METROPOLITAN SCHOOL DISTRICT**
545 W. Dayton Street
Madison, Wisconsin 53703

    Defendant.

## COMPLAINT

Plaintiff, Kelly Lynaugh, through her attorneys, Hawks Quindel, S.C., by Nicholas E. Fairweather, for her Complaint against the Defendant, Madison Metropolitan School District, states as follows:

### NATURE OF ACTION

1. Plaintiff, Kelly Lynaugh, ("Lynaugh") brings this action under Title I of the Americans with Disabilities Act of 1990, as amended by the Americans with Disabilities Amendments Act of 2008 ("ADA"), 42 U.S.C. § 12101, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 *et seq.* to correct unlawful employment practices and to provide appropriate relief to Lynaugh who was adversely affected by such practices.

## JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(4), as this case involves a federal question under the ADA, as amended, 42 U.S.C. §§ 12117, 2000e, *et seq.* and arises under the laws of the United States for the protection of civil rights. The jurisdiction of the Court is invoked specifically to secure protection and redress deprivation of rights guaranteed by federal law, which rights provide for damages, injunctive and other relief for illegal discrimination in employment.

3. Venue is proper in the Western District of Wisconsin under 28 U.S.C. § 1391(b) and 42 U.S.C. §§ 12117(a), 2000e-5(f)(3) because all acts or omissions giving rise to this claim occurred in this district at Defendant's office located in Madison, Wisconsin.

4. Prior to filing this Complaint, Lynaugh obtained a Notice of Right to Sue ("Notice") from the Equal Employment Opportunities Commission, dated July 10, 2015, attached here as Exhibit A. This Complaint is filed within 90 days of her receipt of the Notice.

## PARTIES

5. Lynaugh is an adult resident of the State of Wisconsin, residing at 1249 E. Mifflin Street, Madison, Wisconsin 53703. At all material times to this Complaint, Lynaugh was employed by the Madison Metropolitan School District.

6. Defendant Madison Metropolitan School District ("MMSD") is a Wisconsin school district organized and operated pursuant to Wis. Stat. § 118.

7. At all relevant times, MMSD has been a covered entity under Section 101(2) of the ADA, 42 U.S.C. § 12111(2), employing more than fifteen (15) employees.

## ALLEGATIONS

8. MMSD hired Lynaugh in 1997 to serve as an Assistant High School Principal, a position she held for over fifteen years, most recently at La Follette High School in Madison, Wisconsin.

9. Throughout her employment at MMSD, Lynaugh earned exceptional performance reviews for her dedication and hard work.

10. Unfortunately, Lynaugh became the target of unwarranted scrutiny on the basis of her gender and perceived or actual disabilities beginning in 2011 and 2012.

11. On September 16, 2012, Lynaugh was hospitalized due to an abscess on her kidney, resulting in a nine-day hospitalization.

12. Lynaugh's brother, Brian Lynaugh, informed the Principal at La Follette, Chad Wiese ("Wiese"), about her medical emergency and told him she would not be available for work for the foreseeable future.

13. Lynaugh then requested and received a four week medical leave to treat her serious health condition, a period lasting from September 17, 2012, to October 12, 2012.

14. On October 5, 2012, Lynaugh's physician sent a letter to MMSD which medically cleared her to return to work on a part-time basis on October 15, 2015.

15. Lynaugh returned to work on October 15, 2015, and Wiese immediately requested a meeting in which he proceeded to ask exceedingly personal questions about her medical condition and diagnosis.

16. Lynaugh explained to Wiese at this meeting that she had been diagnosed as an insulin-dependent diabetic and continued on aggressive antibiotics for the abscess but that her doctors did not know when she would be able to return to work full-time.

17. On November 1, 2015, Lynaugh's physician again sent a letter to MMSD which specified that Lynaugh should work a 50% schedule for the next four weeks.

18. Wiese then requested a second meeting between Lynaugh, himself and Robert Nadler ("Nadler"), the Executive Human Resources Director of MMSD, to discuss her health conditions.

19. Nadler asked Lynaugh whether she was receiving treatment for "emotional issues" and whether she was going to be "physically available" for long hours on the job.

20. Lynaugh explained that it was unclear how long it would be until she returned to full health, as she was continuing to work with her doctors to find the most effective treatment for her specific condition.

21. Approximately one week later, Wiese called another meeting with Lynaugh to discuss her health, but this time he invited Nadler and Joseph Gothard, the Assistant Superintendent of MMSD, to join them.

22. The group of men questioned Lynaugh at length about her health and need for additional medical care as well as the progress on her recuperation.

23. Lynaugh explained that the length of her recovery was yet unclear but that she was working with her physician to stabilize her health.

24. Lynaugh felt cornered and intimidated by the repeated questioning about her health by her male colleagues.

25. By November 26, 2012, Lynaugh was cleared by her doctor to return to work full-time without restrictions. Her health had returned to normal and she was performing all of her physical duties without issue.

26. Approximately one week following Lynaugh's return to work full-time, an incident took place at La Follette that involved a student report of a gun on the school grounds.

27. On December 4, 2012, two female students reported to a teacher at La Follette, Alicia Beckett-Webb, that they had heard that a certain male student had a gun in his backpack.

28. Beckett-Webb then telephoned Lynaugh to report the incident.

29. Lynaugh doubted the truthfulness of the report because she had received unreliable information from these two students on multiple former occasions and also because she had interacted with the male student shortly before, while he was wearing his backpack, and had not noticed anything out of the ordinary.

30. Nevertheless, Lynaugh attempted to contact the school's security officer, Madison Police Officer Greg Rossetti, by telephone.

31. Lynaugh also made three attempts to contact him on his radio, but he did not respond.

32. Lynaugh next attempted to contact Rick Rogness ("Rogness"), one of four Assistant Principals at La Follette and the individual in charge of the school's security, regarding the allegations, but he did not answer.

33. Lynaugh then requested that a member of the school's security staff, Alex Garcia, retrieve the male student from the library and escort him to her office.

34. Lynaugh questioned the male student and kept him in her office while she called his parents.

35. Shortly thereafter, Rogness arrived to Lynaugh's office with Rossetti, who proceeded to question the male student and search his backpack.

36. Lynaugh suggested that the school close-off the library in case the male student had hidden the gun there, but Rogness and Rossetti ignored her suggestion.

37. Ultimately, no gun was found or recovered. No police report was made by Rossetti on this incident.

38. Approximately one week later, MMSD's Safety and Security Coordinator, Luis Yudice, issued a report regarding the school's response to this incident after conducting a cursory investigation which failed to include key witnesses.

39. The report placed a disproportionate amount of blame on Lynaugh for failing to contact the police when she learned of the allegations, while failing to indict Rogness—the administrator responsible for coordinating the school's security efforts—for the same inaction.

40. Indeed, both Lynaugh and Rogness questioned the male student about the presence of a gun and neither elected to call police regarding the allegations.

41. Rogness even admitted during a subsequent interview with Joseph Hill, the Coordinator of Expulsion and Truancy for MMSD, that "in hindsight, I should have called the police" thereby acknowledging his own failure in that regard.

42. Yet, only Lynaugh was reprimanded for her response to this incident.

43. Indeed, on February 22, 2013, MMSD reassigned Lynaugh to the Registrar's office and issued her a written reprimand for her role in the incident.

44. Approximately one week after this incident, another student at the school reported seeing a gun fall to the floor in a stall in the girls' bathroom and reported it to a counselor who told the administration.

45. No one in the administration who learned of the report called the police and no one in the administration was reassigned as a result of failing to call the police.

46. These were not the first two instances in which Lynaugh was treated differently because of her gender and/or disabilities.

47. In 2011, Nadler and Gothard had voiced their concerns that Lynaugh, who has a generous physical profile, might not be able to "handle the steps" at

Madison East High School where she was hoping to apply for an assignment as Summer School Principal.

48.     Similarly, Gothard, Wiese, Rogness and Jim Pliner (the Athletic Director of La Follette) as well as Michael Hernandez (the Principal of Sherman Middle School), showed favoritism to male employees beginning in 2010 when Wiese became principal at La Follette.

49.     These five male employees, some who are known to play poker together, formed a "good old boy" network which engaged in a practice of isolating and undermining their female colleagues.

50.     For example, La Follette employed four Assistant Principals—three females and one male—during the latter half of Lynaugh's tenure, all of whom reported directly to Wiese.

51.     Of the four Assistant Principals, Wiese assigned only one, Rogness, a male, to the office beside his, while assigning the three female Assistant Principals to other parts of the building.

## FIRST CAUSE OF ACTION (ADA): ADVERSE EMPLOYMENT ACTION

52.     Lynaugh re-alleges and incorporates herein by reference the above paragraphs.

53.     The ADA proscribes discrimination against a qualified individual with a disability "because of the disability of such individual in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

54. Lynaugh is a qualified individual in that she has a disability, diabetes, that substantially limits one or more major life activities, in this case work.

55. MMSD also regarded Lynaugh as having such an impairment, including her weight and perceived "emotional issues."

56. Lynaugh was qualified for the position in that she satisfied the pre-requisites for the Assistant Principal position and could perform the essential functions of the position, with or without reasonable accommodations. 29 C.F.R. app. § 1630.2(m).

57. MMSD unlawfully demoted Lynaugh because of her disabilities or because of its perception of her disabilities when it reassigned her to the Registrar's office.

## SECOND CAUSE OF ACTION (TITLE VII): GENDER DISCRIMINAION

58. Lynaugh re-alleges and reincorporates the allegations contained in paragraphs 1-57 above.

59. Lynaugh is a member of a protected class, female.

60. Lynaugh was qualified for her position as Assistant Principal and was meeting the legitimate expectations of MMSD.

61. Lynaugh was unlawfully demoted and a similarly situated male colleague, Rogness, was not for failing to report the allegations to police that a male student had a gun on school grounds.

## RELIEF REQUESTED

WHEREFORE, Lynaugh demands judgment against MMSD, ordering:

A. Award of back pay equal to the pay she would have received absent the discriminatory conduct pursuant to 42 U.S.C. §§ 12117, 200e-5(g) and interest on the back pay awarded;

B. Order reinstatement or, alternatively, front pay in an amount sufficient to make Lynaugh whole pursuant to 42 U.S.C. §§ 12117, 200e-5(g);

C. Award compensatory damages for Lynaugh's emotional distress, pain, suffering, mental anguish and other non-pecuniary losses pursuant to and subject to the limitations in 42 U.S.C. § 1981(a);

D. Award punitive damages pursuant to and subject to the limitations in 42 U.S.C. § 1981a(a)(2), (b)(1);

E. Award Lynaugh her reasonable attorney's fee, including litigation expenses, and costs, pursuant to 42 U.S.C. § 12205; and

F. Award other such relief as the Court deems just and proper.

## JURY DEMAND

Lynaugh requests a trial by jury on all issues permitted to be tried to a jury.

Respectfully submitted this 7th day of October 2015.

                        **HAWKS QUINDEL, S.C.**
                        *Attorneys for Plaintiff*


By:     *s/ Nicholas E. Fairweather*
                Nicholas E. Fairweather
                State Bar No. 1036681
                Email: nfairweather@hq-law.com
                222 West Washington Avenue, Suite 450
                P.O. Box 2155
                Madison, Wisconsin 53701-2155
                Telephone: 608/257-0040
                Facsimile: 608/256-0236